IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>LADONIOUS CHURCHILL,<br><br>*Defendant.* | No. 19 CR 101<br><br>Judge Virginia M. Kendall |

### MEMORANDUM OPINION AND ORDER

Defendant LaDonious Churchill is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). This charge resulted from an encounter with Chicago Police Officers on November 23, 2018. During that encounter, police officers approached a vehicle in which Churchill was a passenger, searched Churchill, and recovered a firearm. Churchill now moves to suppress all evidence obtained as a result of this stop, arguing that the vehicle was unlawfully seized, and he was unlawfully searched. (Dkt. 25).

On October 18, 2019, this Court held an evidentiary hearing and heard testimony from the involved officers and civilian witnesses. The parties were then given an opportunity to submit post-hearing briefing. After a review of the testimony, and evidence presented at the hearing, and after determining the credibility of the witnesses, the Court credits the officers' version of events, and denies Churchill's motion.

# BACKGROUND

At the evidentiary hearing, the Court heard from Chicago Police Department Officers Piotr Zdrzalka, Rafael Robledo, and Danielle Ferlito and civilian witnesses Kristin Erickson, Anthony Coleman, and Fabian Newsome.

The officers' testimony was as follows. On November 23, 2018, around 9:50 p.m., Officers Zdrzalka, Robledo, and Ferlito were on patrol in an unmarked police SUV. (Dkt. 45 at 13, 85–88, 153). They were around the 700 block of North Lawndale Avenue, an area known for narcotics sales, gang activity, and gun violence. (*Id.* at 14, 89). While driving northbound in an alley west of Lawndale Ave., the officers encountered a vehicle with its back end protruding into the alley, a parking violation. (*Id.* at 17–18, 91, 162). The officers turned on their spotlights and emergency lights, and stopped their police SUV. (*Id.* at 19–21, 92, 154–55).

As Officer Zdrzalka approached the vehicle, he saw a person in the backseat sliding towards the passenger side, with his hands towards his front as though he was placing something in his front waistband. (*Id.* at 23–24). As Officer Ferlito approached the vehicle, she also noticed that the two occupants in the backseat—later determined to be Churchill and Erickson—were fidgeting with their clothing and their waistband area. (*Id.* at 163). This made Officer Ferlito think that the occupants were trying to conceal something, such as narcotics or a weapon. (Dkt. 45

at 163). Officer Zdrzalka also had the same concern based on the movements he saw Churchill making. (*Id.* at 31).

Officer Zdrzalka approached the rear door on the driver's side and saw Churchill put his hands up. (*Id.* at 28–29). Officer Zdrzalka had his flashlight in hand and he could see the handle of a gun pushed into Churchill's waistband. (*Id.* at 29). Officer Zdrzalka turned off his flashlight and asked Churchill to open the door and step out of the car. (*Id.* at 32). Officer Zdrzalka spoke to Churchill "gently" so as not to alert him that he had seen the gun and possibly cause an unsafe situation. (*Id.* at 32, 77–78). As Churchill was exiting the vehicle, Officer Zdrzalka grabbed Churchill's hands. (*Id.* at 32–33). He then called Officer Robledo by his first name, which was a code the two officers used to express that someone had a weapon and they need assistance right away. (*Id.* at 33, 95). Officer Robledo walked over to Officer Zdrzalka and Churchill, and Officer Zdrzalka directed him to look at Churchill's waistband. (*Id.* at 35, 95–96). Officer Robledo saw a small object protruding from Churchill's pants just below the waistline. (*Id.* at 95–96). Officer Robledo recovered and secured the weapon. (*Id.* at 35, 97). Officer Zdrzalka then arrested Churchill. (*Id.* at 37). At that point, Erickson was speaking with Officer Ferlito, and the driver, Coleman, was still in the car. (*Id.* at 37–38, 98–99). Officer Robledo asked Coleman to exit the vehicle. (*Id.* at 38). Officer Robledo patted Coleman down but did not arrest him. (*Id.* at 98–99). Officer Zdrzalka issued Coleman a ticket for having parked partially in the alley. (*Id.* at 41–45).

The testimony of the other witnesses contradicted that of the officers. The other people in the vehicle, Coleman and Erickson, testified that the vehicle was fully parked in the lot and was not protruding into the alley. (*Id.* at 121–22, 168). Coleman testified that he never received a parking ticket, nor has he been notified about any unpaid tickets. (*Id.* at 169–170). Newsome, a friend of the others who was present and whose family owned the lot in question, also testified that the vehicle was not protruding into the alley. (*Id.* at 180). He did not see the incident first hand, but reviewed footage from his security camera which recorded the events. (*Id.* at 181–82). Additionally, Erickson and Newsome both testified that Churchill was not placed into custody immediately upon exiting the vehicle, but rather that officers spoke with him for some time before recovering the gun and placing him into custody. (*Id.* at 128–29, 183–184).

## **DISCUSSION**

The Court must first address the dispute of fact as to whether the vehicle was parked with its end protruding into the alley or whether it was parked entirely within the lot. "This is a classic credibility determination," and the Court is presented with "two divergent accounts, neither of which is facially implausible." *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018). Given this Court's "opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing," this Court credits the three officers' version of events. *Id.* (internal quotation marks omitted).

As is typical, there were some gaps in all of the witness's testimony. For example, Erickson testified that she had only a "loose awareness" of the other occupants of the car during the stop, and that her focus was not on Churchill during the stop because the police were questioning her at the same time. (Dkt. 45 at 126–127). She did not see Churchill taken out of the car, patted down, or see the weapon recovered. (*Id.* at 126–28). Although Erickson and Coleman both testified that the vehicle was parked on the lot and not in the alley, they gave differing accounts of where on the lot the vehicle was parked. (*Id.* at 144, 173).

There were also gaps in the officers' testimony and Churchill points to one discrepancy in particular as being dispositive. Officers Zdrzalka and Robledo testified that the vehicle was parked partially in the alley so as to prevent the police SUV from continuing on through the alley. (*Id.* at 17, 91). Later, however, Officer Zdrzalka testified that he left the scene by continuing to drive northbound through the alley, without indicating that the vehicle had been moved, which suggests that the vehicle was not, in fact, blocking the police SUV from driving through the alley. (*Id.* at 56). Erickson testified that the officers did not move the vehicle during the stop. (*Id.* at 130).

The Court declines to discredit all three officers' testimony based on the lack of explanation as to how the officers ultimately exited the alley. The testimony did not foreclose the possibility that the driver, Coleman, moved his car so as to allow the officers to exit after the stop concluded. It is also possible that the officers exaggerated the extent to which the vehicle was blocking the alley—it may be that

the vehicle was protruding into the alley without being so far back as to entirely block the alley. Officers Zdrzalka and Robledo testified that the police SUV stopped because its path through the alley was impeded. There is little other reason for the officers to have noticed, let alone stopped, a car parked within a private lot, and the Court credits the officers' testimony that their reasoning for noticing and stopping the vehicle was its protrusion into the alley.[1]

There are additional reasons that the Court credits the testimony of the officers over the other witnesses. In addition to Erickson's admitted lack of attention to the events in question, she also has a recent history of dishonesty as she was convicted of forgery in 2019. (*Id.* at 132). Further, Newsome, who had a video recording of the events, did not save the video or provide it to Churchill, despite knowledge that his friend, Churchill, had been arrested based on the events on the video. (*Id.* at 186–187). Newsome's failure to save the video or at least provide a copy to Churchill suggests that its contents may not have been exculpatory.

Accepting that the vehicle was protruding into the alley, the Court turns to the validity of the stop. The officers seized the vehicle—they blocked it in and turned on their emergency lights and then approached. (*Id.* at 21). The vehicle and its occupants were not free to leave. *See United States v. Johnson*, 874 F.3d 571, 574 (7th Cir. 2017) ("We grant that the police did more than just stroll up: two squad cars,

---

[1] The possibility of an ulterior motive for a stop is irrelevant, "because analysis under the Fourth Amendment is objective." *United States v. Johnson*, 874 F.3d 571, 573 (7th Cir. 2017). That being said, even if motive were relevant, the testimony at the hearing does not lead the Court to believe that the officers acted with an ulterior motive. Notably, Officer Ferlito recovered marijuana from Erickson but did not issue Erickson a ticket for it. (Dkt. 45 at 159). This evidence is inconsistent with the idea that the officers were merely seeking to seize and harass the occupants of the vehicle.

which bathed the parked car in bright light, implied that the occupants were not free to drive away. The district judge treated this as a seizure; so do we. But issuing a ticket always entails a brief seizure."). The next question is whether there was probable cause to seize the car and its occupants in order to issue a ticket. Probable cause to believe that a vehicle is engaged in a parking violation supports a stop. *See Whren v. United States*, 517 U.S. 806, 819 (1996) (concluding that "probable cause to believe that petitioners had violated the traffic code. . . rendered the stop reasonable under the Fourth Amendment"); *Johnson*, 874 F.3d at 574 (". . . *Whren* applies to both parking and moving offenses.).

The City of Chicago Municipal Code § 9-64-130 provides:

 (a)   It shall be unlawful to park any vehicle in any alley for a period of time longer than is necessary for the expeditious loading, unloading, pick-up or delivery of materials from such vehicle.

(b)   It shall be unlawful to park a vehicle in an alley in such a manner or under such conditions as to leave available less than ten feet of the width of the roadway for the free movement of vehicular traffic or to block the entrance to any abutting property.

Because this Court credits the officers' testimony that the vehicle was parked protruding into the alley, it concludes that the officers had probable cause to stop the vehicle on the grounds that it was violating this provision of the Municipal Code. Given that the vehicle was parked partially in the alley (regardless of whether it was entirely blocking passage through the alley), the officers had "an objectively reasonable basis to believe," *United States v. Reaves*, 796 F.3d 738, 741 (7th Cir. 2015), that the vehicle was parked in violation of City of Chicago Municipal Code § 9-64-130. *See Reaves*, 796 F.3d at 741 ("[W]e need only inquire whether the officer had

probable cause to believe that a traffic violation occurred, not whether a violation actually occurred." (internal quotation marks and citations omitted)); *see also* Dkt. 45 at 82 (Officer Zdrzalka testified that to issue a ticket for this violation a vehicle need only be "partially" in and blocking the alley). The testimony at the hearing did not support the exception for loading and unloading--the testimony was that the car was parked. (Dkt. 45 at 122–23 (Erickson noting that the car had been parked for "[a]pproximately five or ten minutes" before the police arrived)). Further, officers with probable cause are entitled approach vehicles without resolving all possible statutory exceptions. *Johnson*, 874 F.3d at 573.[2]

Having determined that the stop of the vehicle was valid, the Court addresses the search of Churchill.

> During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment. The officers may also frisk the driver and any passengers upon reasonable suspicion that they may be armed and dangerous. Whether an officer has a reasonable suspicion to support such a frisk is a fact-specific inquiry that looks at the totality of the circumstances in light of common sense and practicality. In determining whether an officer had reasonable suspicion, courts consider the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. The time and the location of the stop are also relevant to the reasonable suspicion inquiry.

*United States v. Tinnie*, 629 F.3d 749, 751–52 (7th Cir. 2011) (internal quotation marks and citations omitted).

---

[2] The parties dispute whether any ticket was actually issued for violation of this provision. That is irrelevant to whether there was probable cause to initially stop the vehicle. It goes only to credibility, and for the reasons previously stated, the Court credits the officers' version of events.

Crediting the officers, the facts here are very similar to those in *Tinnie*. In *Tinnie*, the Seventh Circuit concluded that the totality of the circumstances justified a frisk of the defendant upon a traffic stop because the area was known to have high levels of crime, the officer was part of a special unit with familiarity with risk of gun possession, the defendant acted suspiciously by "moving around nervously as the officers approached the car," and the defendant gave odd answers to the officer's questions during the stop. *Id.* at 752; *see also United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013) (nighttime stop in a high-crime area contributed to the totality of circumstances justifying a frisk).

Here, the officers were on patrol at nighttime in an area known for gang activity and gun violence. (Dkt. 45 at 14, 89). They were part of a unit focused on high-crime areas with gang violence, including gun crime, and thus had special knowledge about gun crime. (*Id.* at 9–10, 85). As they approached the vehicle, both Officer Zdrzalka and Officer Ferlito saw Churchill making movements around his waistband that suggested to them that he might be trying to conceal a weapon. (*Id.* at 31, 163). And even more compelling than in *Tinnie*, Officer Zdrzalka testified that he actually saw the handle of a gun pushed into Churchill's waistband. (*Id.* at 29).

Again, the parties' witnesses offer differing accounts of the events in question. Churchill points to testimony about the timing of events. He notes that Officer Robledo had time to speak with another person on scene for "less than a minute, a minute, two minutes, whatever it took me to write down his information." (*Id.* at 113). And Churchill notes that Officer Ferlito had time to ask Erickson several

questions, and during that period, Officer Ferlito saw Churchill speaking with Officer Zdrzalka without Officer Robledo. (*Id.* at 156–60). Churchill says that the other officers' testimony is inconsistent with Officer Zdrzalka's testimony that he immediately called over Officer Robledo and frisked Churchill.[3]

The Court disagrees that the testimony presents inconsistencies on the timing of events. Officer Zdrzalka testified that he spent some time "gently talking to" Churchill to ask him to open the door. (*Id.* at 32). He spent enough time talking to Churchill to tell him everyone had to get out of the car, that he would run their names, and that he would talk to the driver. (*Id.* at 32–34). It was not until Churchill stepped out of the vehicle that Officer Zdrzalka took his hands and called Officer Robledo over to pat Churchill down. (*Id.* at 34). This whole process must have taken at least one to two minutes, consistent with both Officer Robledo and Officer Ferlito having time to speak with others before Officer Robledo was called over to frisk Churchill.

Churchill also argues that Officer Zdrzalka's testimony that he did not immediately alert the other officers to the presence of the gun is not credible. Again, the Court disagrees. For one, he did notify his partner using their code of calling out the other officer's first name. Further, Officer Zdrzalka's testimony that he was making all efforts not to escalate the situation—including by not calling out that there was a gun—was very credible and is in fact how one might hope an experienced

---

[3] Newsome, a witness for the defense, testified that the officers spent seven to ten minutes talking to Churchill before arresting him. (Dkt. 45 at 183). This testimony was not consistent with that of other witnesses, including Erickson, who testified that she did not have an accurate recollection of the timing but believed that the officers spoke to Churchill for "a minute or two" before placing him into custody. (Dkt. 45 at 128–29).

officer would proceed when a suspect has a weapon. Officer Zdrzalka did not want to alert Churchill of his awareness of the gun, and Officer Zdrzalka knew that he could control the situation by taking Churchill's hands and not giving him the opportunity to grab the gun. (*Id.* at 34).

Briefly addressing Churchill's other contentions, the Court finds it entirely possible that, even approaching from behind the vehicle, Officer Zdrzalka could have seen what movements Churchill was making with his body and arms—especially given that the stopped vehicle was bathed in spotlight. Finally, that Officer Zdrzalka and Officer Robledo did not give identical descriptions of where on Churchill's person the gun was is consistent with the evidence. Officer Zdrzalka saw the gun protruding from Churchill's waistband, but Officer Robledo did not. (*Id.* at 97). Yet Officer Robledo saw a bulge that was "sliding down," which is consistent with the idea that the gun might start sliding down from Churchill's waistband once he went from a sitting to standing position. (*Id.* at 97).

Officer Zrdalka's testimony about the search of Churchill was credible, plausible, and was supported by the testimony of the other witnesses. The Court credits it and determines that, given the totality of the circumstances, Officer Zrdalka had reasonable suspicion that Churchill was armed and dangerous, and the officers permissibly frisked him.

## CONCLUSION

For the foregoing reasons, the Court concludes that both the parking stop and the search of Churchill's person were valid. Churchill's motion to suppress is therefore denied.

_____
Virginia M. Kendall
United States District Judge

Date: February 19, 2020